## AFFIDAVIT OF GERALD F. CAHILL

I, Gerald F. Cahill, being duly sworn, depose and state as follows:

1. I am a Police Officer with the Boston Police Department where I have worked for more than 10 years. I am currently assigned to the Drug Control Unit ("DCU") in District C-11, which covers neighborhoods in the Lower Dorchester area of Boston. I have worked at the District 11 DCU since 2007.

2. During my tenure with the Boston Police Department, I have participated in investigations relating to the distribution of controlled substances including cocaine, cocaine base (also known as "crack cocaine"), heroin, marijuana, and other illegal drugs and have received training in the area of narcotics investigations. I have been the affiant on affidavits in support of search warrants, arrest warrants, and other applications. I have also made many seizures of crack cocaine and have identified it in the field on dozens of occasions.

3. This Affidavit is submitted in support of an application for a criminal complaint charging **ANDREW HENDREN** with distribution of heroin and possession of cocaine with intent to distribute in violation of Title 21, United States Code, Section 841(a)(1). On August 9, 2012, **HENDREN** was arrested in the area of 51 Wildwood Street in Dorchester after it was determined that he

-1-

had sold suspected heroin to SCOTT BOLTON. At arrest, 38 additional bags of suspected crack cocaine were recovered from **HENDREN**'s mouth and from plastic bags secreted in his pants.

4. I am familiar with and was present during the underlying investigation. I wrote the Incident Report pertaining to **HENDREN**'s arrest and spoke with the officers who arrested HENDREN at approximately 2:00 p.m. that afternoon.

5. This affidavit does not set forth all the facts developed during the underlying investigation. Rather, it sets forth facts I believe sufficient to establish probable cause to believe that **HENDREN** committed the crimes set forth in the accompanying Criminal Complaint.

6. The job of the C-11 Drug Control Unit is to enforce narcotics laws in our District. We do this through a variety of investigative techniques, one of which is to set up surveillance in locations where drug dealers are known to meet with their customers to conduct drug transactions and then to make arrests when we are able to observe and investigate identifiable drug activity. While there are a variety of such locations in our district, many are in and around mass transit stations where there is generally lots of foot traffic and to which the general public has ready access.

7. Activity in these ongoing efforts took place at on August 9, 2012 when I and other officers from the District C-11 DCU were

conducting drug operations in the area around the Ashmont "T" Station located near the intersection of Dorchester Ave and Bailey Street. My unit has made numerous drug arrests in this area, which is one of the many locations in our district that attracts drug dealers and their customers.

    8. In the early afternoon of August 9, 2012, members of the C-11 DCU were conducting surveillance of the type described above. At about 1:30 p.m., a male subsequently identified as **ANDREW HENDREN** caught the attention of Detective Andrew Miskell of my unit. Detective Miskell saw **HENDREN** standing on Bailey Street about a quarter of the way up from Dorchester Ave. and noted **HENDREN** making a quick phone call and then looking around as if waiting for someone.

    9. A short time later, Detective Miskell watched as a white GMC Yukon bearing MA Reg 592SS4 driven by a black male later identified as JERMAINE GRANT pulled up to **HENDREN** near St Marks' Post. **HENDREN** got into the passenger side and the Yukon continued down Bailey Street towards Dorchester Ave past Detective Miskell.

    10. The Yukon took a right on Dorchester Ave., drove past the Ashmont Station, and then took a left on Beale Street, stopping in front of a store that GRANT entered for a few minutes while **HENDREN** waited in the car. When GRANT came back out, he backed the Yukon down Beale to Dorchester Ave. and proceeded

inbound on Dorchester Ave. before making a right turn on Centre Street. GRANT then stopped when he reached the corner of Leslie Street, where he again parked the SUV, got out, and went into a house. Once again, **HENDREN** remained in the car.

11. GRANT was in the house on Centre Street for only a short time. When he came out, he got right back in the Yukon and drove off with **HENDREN**, taking a series of turns in order to get **HENDREN** right back to where he started on Bailey Street, not far from the Ashmont T Station.

12. When the Yukon got back to Bailey Street, **HENDREN** jumped out and walked to the nearby Dunkin Donuts Store located at the corner of Dorchester Avenue, where he met up with a black man (while GRANT and the Yukon continued to wait). After some conversation with this individual (who was never identified), **HENDREN** and the second male went inside the Dunkin Donuts and I followed them. As I entered, **HENDREN**, the second male, and a white male later identified as SCOTT BOLTON passed by me as they were going out.

13. **HENDREN**, BOLTON, and the third male began walking up Bailey Street with **HENDREN** and BOLTON in the lead and the unidentified black male following several steps behind. As BOLTON proceeded up Bailey Street with **HENDREN**, I saw him take something out of his pocket and hold it in front of him (just before he and **HENDREN** went out of my sight). Seconds later,

-4-

BOLTON and the unidentified black male came walking back down Bailey Street while **HENDREN** was seen getting into the Yukon, which immediately began to leave the area.

14. Based on our belief that we had just witnessed a drug transaction, Officer Rogers and I followed BOLTON and the second man as they walked back inside the Dunkin Donuts Store while other members of my unit followed **HENDREN** in the Yukon. Rogers and I approached BOLTON (who was with a female inside the store) and identified ourselves. He refused to speak with us and turned away towards a bag at his feet. After a brief scuffle, we were able to get him and the bag outside so we could speak with him.

15. Once Officer Rogers and I had BOLTON in the parking lot, we told him what we had seen and asked if him if he had any drugs on him. After he denied having any drugs and refused to acknowledge the things we had seen him do, I looked inside a bag and saw a plastic bag containing a brown powder I identified as heroin. I immediately <u>Mirandized</u> BOLTON, after which he admitted to me that he had just bought the drugs from the guy he "just met," a reference to **HENDREN**.

16. After getting this information from BOLTON, I immediately radioed Sgt. Det. Assad to tell him that we had recovered drugs from BOLTON.

17. By the time I contacted Assad, the Yukon had pulled over on its own near 51 Wildwood Street where there were a number

of females sitting on a porch. Detective Miskell, Officer Alicea, and Sgt. Det. Assad approached the Yukon with Miskell taking the driver's side (where GRANT was sitting) and Alicea and Assad going up the passenger side to speak with **HENDREN**. When Assad asked **HENDREN** to step out so he could speak to him and Officer Alicea, he saw that **HENDREN** was chewing something in order to swallow it. Officer Alicea immediately grabbed **HENDREN** and ordered him to spit the items out of his mouth. When **HENDREN** eventually did, they recovered 2 plastic bags of suspected crack cocaine.

18. **HENDREN** was then placed under arrest and <u>Mirandized</u>. **HENDREN** repeatedly stated, "Oh shit, I am fucked." During a search of his person conducted incident to his arrest, Detective Miskell recovered a total of 36 additional bags of suspected crack cocaine that **HENDREN** had hidden in his pants. Two cellular phones and $501 were also recovered from **HENDREN,** who indicated he was unemployed at booking and had not worked for some time. **HENDREN** also advised that he sold the drugs seized from him for $30 a bundle and had been doing so for several weeks.

19. While all this was going on, Officer Rogers and I continued to speak with BOLTON. BOLTON told us that he paid $60 for the heroin we seized from him and knew the guy he purchased it from only as "ACE." BOLTON also stated that he contacts ACE using a number he had written down. I then noted a piece of

paper in BOLTON's bag with "ACE 617-669-0594" written on it. After we returned to District C-11 for **HENDREN** to be booked, I dialed number 617-669-0594 and noted that an AT&T phone seized from **HENDREN** immediately began to ring.

20. The plastic bag retrieved from BOLTON was taken back to District C-11 to be logged into evidence and field tested positive for heroin. One of the 38 bags of suspected crack cocaine seized from **HENDREN** was also field tested and it tested positive for cocaine. All of the drugs have been sent to the State Laboratory for further analysis.

21. Based upon the foregoing, I submit there is probable cause to believe that, on August 9, 2012, **ANDREW HENDREN** distributed heroin and was in possession of cocaine with intent to distribute, all in violation of Title 21, United States Code, Section 841(a)(1).

Signed under the pains and penalties of perjury this 13th day of September, 2012.

_____
OFFICER GERALD CAHILL

Sworn to and subscribed before me this 13th day of September, 2012.

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE